## SMITH *v.* SMITH.

### 4-3730

Opinion delivered November 12, 1934.

*Miller & Yingling* and *Culbert L. Pearce,* for appellant.

*Gordon Armitage, Gregory & Taylor, Ross Mathis* and *W. J. Dungan,* for appellee.

BAKER, J. This is an election contest case. The only question to be determined is the sufficiency of the complaint on demurrer. The complaint alleges in effect that at the Democratic primary election, on August 14, 1934, the plaintiff, appellant here, the defendant, appellee, and Grafton Thomas, qualified electors and residents of White County, qualified and entered the race as rival candidates for the nomination to the office of county and probate clerk. The names of the plaintiff, the defendant and Grafton Thomas were properly placed upon the official ballots used in the various precincts of the county, to be considered and voted upon for said nomination; that, after said primary election was held on Aug-

ust 14, returns were duly made under the law and the rules of the party showing the ballots cast in the various precincts of the county.

The Democratic County Central Committee at its meeting tabulated, totaled and declared and published the returns.

On the face of said returns, said committee found and declared that the defendant received 2,503 votes and the plaintiff received 1,642 votes and the said Grafton Thomas received 1,470 votes. The committee certified that the defendant had received the highest number of votes and plaintiff had received the second highest number cast for the nomination for said office and were therefore eligible and entitled to enter the race in a second primary election to be held on August 28, 1934, under the provisions of act 38 of the General Assembly of 1933, known as the "Run-Off Primary Act," to ascertain which of them might receive a majority of all votes cast in said second primary and thereby become entitled to final certification as the nominee for said office as aforesaid.

The names of the plaintiff and defendant were so certified by the chairman and secretary of the said committee and placed upon the official ballots used in said second primary election, to be considered and voted upon as rival candidates for said nomination, as in the first primary.

On August 28, 1934, said second primary was held under the rules of the party and the law, and in due time the judges and clerks of said election in the various precincts made returns of the ballots cast in their respective precincts, as required by the rules of the party and the law.

On August 31, 1934, the county central committee met at the court house in the city of Searcy and tabulated, totaled, declared and published the returns as sent in by the various precincts. On the face of said returns, it found and declared that the defendant received 2,190 votes and the plaintiff received 2,114 votes. Said committee then certified that the defendant was the nominee of the party for said office, to be voted upon at the general election.

Plaintiff alleged that, as a result of fraud and errors, the defendant was declared the party nominee when the plaintiff should have been so declared. The contestant further alleged that there were 475 persons having no poll tax receipts issued to them for the year 1933, who, by reason thereof, were totally disqualified to vote in said primary election, but were permitted to vote and did vote in said election, and cast their ballots for the defendant; that all such votes should be declared illegal and void and should be deducted from the number of votes certified in favor of the defendant. Then followed a list of those voting in the separate townships, which list showed the number of the ballot and the name of each alleged disqualified voter.

The second allegation was to the effect that there were 161 persons voting in the election who, if their names were correctly entered on the poll books, do not have poll tax receipts issued to them for the year 1933, although receipts were issued to persons of similar names. That the contestant was not advised as to whether that matter is the result of an error in entering these names on the poll books or in recording their names in the poll tax records, and alleges that they do not have poll tax receipts for the year 1933 legally issued to them prior to June 15, 1934, and that they were not entitled to vote in said primary election; that all of said persons cast their ballots for the defendant; that their votes, being illegal and void, should be deducted from the number of votes certified in favor of the defendant by the Central Committee. The names of the persons were listed.

The plaintiff further alleged that more than 750 persons in the county held illegal poll tax receipts, issued to them for the year 1933 by the collector of White County; that said receipts are illegal because of being predicated upon false and fraudulent assessment lists and because of having been, in most instances, issued after June 15, 1934.

There was a further allegation that through concerted action and collusion of the defendant, who was tax assessor of White County, and the county tax collector, one of his partisan supporters, and other persons

associated with them, some eight or nine hundred poll tax assessment lists were made up and entered upon the assessment records of White County; that said assessments were so made without authority from persons whose names were used, and later poll tax receipts were issued upon said illegal assessments and delivered to such of said persons as the defendant and his associates, after investigation, considered friendly to them and likely to cast ballots for the defendant and other candidates for whom said persons, so collusively acting, were interested; that the poll tax receipts were paid for by the defendant and his associates who, like him, were candidates for nomination in said election; that most of said receipts were issued after June 15, 1934, and were wrongfully certified by the collector as having been issued prior to June 15, 1934, and, by reason of said false and fraudulent certification, the names of the persons to whom said poll tax receipts were issued appeared in the printed list of qualified electors as among those who were entitled to vote in all legal elections held between July 1, 1934, and July 1, 1935.

Plaintiff further alleged that the defendant agreed to pay, and did pay, $300 into a fund to be used in paying for and distributing said illegal poll tax receipts. The recipients of said illegal poll tax receipts have not paid the defendant and his associates for said poll tax receipts and did not agree to do so.

No list was made of the several hundred alleged holders of illegal poll tax receipts. Contestant alleged that more than 500 of these persons were permitted to vote, did vote in said election, and cast their ballots for the defendant.

He alleged further that in Dogwood township, by error and wrongful certifications, sixteen more votes were certified for defendant and sixteen less votes for plaintiff, than were actually cast for them respectively.

Then followed a prayer wherein the plaintiff prayed the court to find and declare that he received a majority of all legal votes cast for the nomination for county and probate clerk of White County, and that an order be issued, directed to the chairman and secretary of the

White County Democratic Central Committee requiring them to certify said nomination as should be done. He prayed an order impounding the ballot boxes, ballots, tally sheets, poll books and all other papers and records used in holding said primary election and that the same be placed in the custody of some suitable, disinterested person whom the court might select, to be held subject to its orders; that all assessment lists and records pertaining to poll taxes issued for the year 1933, payable in 1934, in the custody of the defendant as assessor of White County, Arkansas, be likewise impounded and placed in the custody of some suitable, disinterested person whom the court might select, to be held subject to its orders; that all records, papers and memorandums in the collector's office pertaining to the issuance of 1933 poll tax receipts be likewise impounded and put in the custody of some suitable, disinterested person, subject to the orders of the court and for all other proper relief.

The complaint was verified by the contestant and by 22 reputable citizens. It is unnecessary to set forth the oath made by the plaintiff and the supporting affiants, as this is not called into question.

On September 12, an amendment to the complaint was filed setting forth the names of some of the persons voting, the townships in which they voted and the number of ballots, with the challenge as to the validity thereof. This statement is sufficient to show the issues.

On September 22 the defendant filed a general demurrer to the effect that the complaint does not state a cause of action under the laws of the State of Arkansas regarding election contests. The court sustained the demurrer and dismissed the complaint.

We think the court was in error in sustaining this demurrer. Contestant alleged that he received 2,114 votes and that the contestee had received 2,190 votes. There was a difference between the number of votes they received, as certified, of only 76 votes. The contestant did not say that the votes he had received were "legal votes." Upon this failure to plead that fact, the demurrer is based. An analysis of this complaint will demonstrate that was unnecessary. He was not impeaching the votes

he received in any particular, except in the fourth division of the complaint he alleged that he was entitled to sixteen more votes, received in Dogwood township, than had been certified for him, and otherwise he was treating the number of votes he received, and which were certified to him by the county democratic central committee, as being the total number of votes to which he was entitled. The other portions of the complaint differ somewhat from the usual complaint filed in election contests. He alleged that his opponent received a considerable number of votes that were illegal, specifically pointing out all such illegal votes in every instance except one, but he did not claim that these illegal votes should be credited to him, or be counted for him, but only that they should be deducted from the number of votes received by the contestee. For instance, he alleged that there were 475 persons, whose names were listed by township and ballot number, who were not qualified to vote and asserted that they did vote for the contestee. If this statement, as alleged, is correct and can be proved, then the number of 475 votes should be deducted from the number of votes certified to the contestee. The fraud charged was alleged to have taken place at the voting precincts as distinguished from a charge of error or bad faith of the election officers.

The contestant did plead the number of votes received. He alleged affirmatively that there should have been certified to him sixteen more votes. For consideration upon the demurrer, it must be conceded he did receive 2,130 votes and that they were legal.

In *Tucker* v. *Meroney*, 182 Ark. 681, 32 S. W. (2d) 631, the court said: ''We do not agree with contestant in this contention. The official returns of the election are *quasi* records, and are *prima facie* correct. The burden is upon the contestant to show by affirmative proof that they do not speak the truth.''

In the case of *Morrow* v. *Strait*, 186 Ark. 384, 53 S. W. (2d) 857, the court said: ''The official returns of the election are *prima facie* correct, and the burden of showing that they are not correct rests upon the person who alleges that fact.''

Under the authority of these two cases, we have no hesitancy in holding that there is an affirmative allegation that the votes received by the contestant were legal votes, though the word "legal" is not used; but his pleading is susceptible of no other interpretation.

There is also the allegation that this number of votes contestant received, as certified, is substantially in excess of the number of "legal" votes received by the contestee, so it must be seen that the contestant alleged, at least, a *prima facie* case. Contestant had the right, after the issues were made up, and could have been required by proper motion to file a list of names of voters whose names had been omitted as among those whose votes were challenged. We held this in the case of *Winton* v. *Irby, ante* p. 906.

We but recently said in effect that the statute providing for contesting elections should be liberally construed; that the purpose of the contest is to determine what candidate received the greatest number of legal votes, and if there are sufficient facts stated to give the other party reasonable information as to the grounds of the contest, then the case should be tried on its merits. *LaFargue* v. *Waggoner, ante* p. 757. We also said in the same case that the rule relating to pleadings must not be so strict as to afford protection to fraud, by which the will of the people is set at naught.

The court said in the same case: "The statute does not require supporting affidavits of the citizens to these permissible amendments. These amendments may be made without the supporting affidavits and after the expiration of the original ten days, when unreasonable delay in the trial of the cause will not result therefrom."

In *Winton* v. *Irby, supra,* we said: "The real issue is, which candidate received a majority of the legal votes cast? If his competitor was ineligible, this would not entitle the contestant to receive the certificate of nomination, unless the contestant received a majority of the legal votes.

The instant case is peculiar in one respect, and that is that the candidate relies on the certificate of the Democratic County Central Committee as to the number of

votes received by him, but impeaches, by his complaint, the count in favor of his opponent and alleges that his opponent, the contestee, did not receive the number of legal votes as certified by the committee.

While we do not think that it is absolutely essential to the trial of the cause that the amendment offered by the contestant after the demurrer was sustained should be filed, but, since it adds no new cause of action, and only states the result or effect of the matters already pleaded, it was not improper. It was helpful, however, to file it, as it did aid, by way of explanation or amendment, the pleadings already filed, and upon which the issue, by demurrer, was raised.

We held in the case of *Winton* v. *Irby, supra,* that it was proper to permit the contestant to amend his complaint after the ten-day limit, by filing the list of names of the voters whose ballots were challenged. Such amendment did not set up any new cause of contest. The amendment was only explanatory of matters already, perhaps, somewhat imperfectly pleaded.

It follows that the judgment should be reversed. It is therefore ordered that the judgment be reversed with directions to overrule the demurrer, and permit the cause to proceed to trial upon its merits.